UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

PATRICIA M.,

    Plaintiff,

    v.

ANDREW SAUL,
Commissioner of Social Security

    Defendant.

No. C 19-05829 WHA

**ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

In this review of the denial of continuing Social Security benefits, both parties move for summary judgment. The administrative law judge below applied the wrong law in evaluating plaintiff's medical improvement and assessing her ability to work. Thus, for the reasons stated herein, the decision below is **VACATED** and the matter is **REMANDED** for further proceedings.

**STATEMENT**

**1.    PROCEDURAL HISTORY.**

In September 2011, the Social Security Administration first awarded plaintiff Patricia M. Disability Insurance Benefits under Title II of the Social Security Act. An administrative law judge found that plaintiff had suffered from bipolar disorder and anxiety since September 2009. The ALJ recommended a continuing disability review in four years (AR 335–37).

At that review, though, the SSA determined that plaintiff's condition had improved and she was no longer disabled. In March 2015, the SSA notified plaintiff that her benefits would cease at the end of May. Upon plaintiff's request for reconsideration, a disability hearing

officer affirmed the determination that she was no longer disabled. Plaintiff appealed. She requested a hearing before an ALJ in May 2016. Though originally scheduled for August 2017, the hearing was postponed twice, and plaintiff finally appeared before Administrative Law Judge David LaBarre in April 2018 (AR 338–39, 350–77, 269).

### 2. TESTIMONY AT THE ADMINISTRATIVE HEARING.

At the hearing, Patricia, then 59, testified that her condition had not improved since 2011. Instead, she still felt "severely depressed." Plaintiff acknowledged some suicidal ideation, and though it was under close supervision by her psychiatry team, also testified to near-constant anxiety, fatigue, trouble concentrating, and occasional bouts of hypomania. These symptoms severely impeded routine activities such as getting out of bed, showering, retrieving the mail, and preparing dinner. Plaintiff did enjoy a few activities, though not without some degree of struggle. She attended church and played the clarinet, but withdrew from Bible study because she could not focus and felt self-conscious (AR 273–88).

Further, plaintiff repeatedly testified that she was gripped by "panic" and "fear" on leaving her home, preferring to have her husband or daughter accompany her on most outings. While she could pick up her grandson from preschool and babysit him at home, she would cancel when she wasn't "feeling up to it." When plaintiff worked part-time at an Ohlone College summer enrichment program for children, her husband drove her to and from the program, helped her set up the classroom, and stayed nearby while she was in class (AR 273–80, 296, 616).

Brenna M., plaintiff's adult daughter who had recently lived with plaintiff for three years, testified that she observed her mother's worsening panic attacks. Plaintiff would have to stop everything and take medication to "settle down," which took several hours. Brenna estimated that plaintiff experienced these episodes roughly once every four days. Brenna corroborated that her mother was often unable to get out of bed, was slow to complete household chores, and preferred not to leave the house alone. She testified to plaintiff's obsessive negative ruminations about feelings of guilt and burdening others. Based on her observations, Brenna

opined that her mother would not be able to consistently get herself up and out of the house enough to sustain full-time work (AR 300–07).

Finally, Kathleen McAlpine, the SSA's vocational expert, testified that a person with most of plaintiff's functional limitations could find work in the national economy. McAlpine ruled out plaintiff's past work as a teacher but presented three alternative occupations that plaintiff could hypothetically hold: janitor, stock clerk, or hand packager. But when the ALJ added that plaintiff would probably miss three days of work per month due to psychological symptoms, McAlpine testified that regular absenteeism would preclude *any* steady work. In the vocational expert's experience, "if you're absent 2 to 3 times a month, you usually can't maintain your employment" (AR 316–19).

### 3. MEDICAL EVIDENCE.

Plaintiff's history of mental illness and treatment records trace to 1995, but her conditions did not prevent her from working until September 2009, when she experienced a severe "break down" and left her job teaching third grade. In addition to the testimony at the hearing, the ALJ considered medical evidence from plaintiff's treating doctors and therapists, as well as state-appointed medical consultants who reviewed the record and issued their own opinions (AR 998–1005, 230–34).

#### A.   Evidence From Plaintiff's Treating Physicians.

Plaintiff has pursued mental health treatment continuously since 2009 from a psychiatrist, individual therapists, and various group therapies. In appointment notes, her treating doctors and therapists recorded the subjective content of the meeting, as well as two objective measures of plaintiff's progress: a mental status evaluation (MSE) and an Adult Outcomes Questionnaire (AOQ). The MSE is a list of sixteen observable patient attributes (*e.g.* appearance, behavior, mood, attention, impulse control, etc.). In administering the MSE, a mental health professional records their impressions of the patient in each category for that visit (*e.g.* Demeanor: slightly withdrawn; Speech: normal; Concentration: impaired). Next, the AOQ has two relevant components: the Patient Health Questionnaire-9 (PHQ-9) and the Global Distress Score (GDS). These brief questionnaires ask the patient how often they have

3

1    experienced a list of depressive symptoms from 0 (not at all) to 3 (nearly every day).  The

2    PHQ-9 and GDS scores are then summed, with higher scores reflecting more severe

3    depression.

4        Plaintiff has seen psychiatrist Dr. Ramineni R. since 1995.  Dr. R. prescribed a battery of

5    medications to control plaintiff's depression, anxiety, bipolar disorder, insomnia, and

6    migraines.  As of 2017, her regimen included Seroquel, Lithium, Lamictal, Wellbutrin,

7    Klonopin, and Gabapentin.  Dr. R. appears to have relied heavily on the AOQ in evaluating

8    plaintiff's progress, repeatedly referencing plaintiff's PHQ-9 and GDS scores in appointment

9    notes (AR 1106, 809, 1088, 846).

10       Dr. R. submitted a letter to the ALJ in November 2017, observing that plaintiff

11   "continues to struggle with depression, anxiety, concentration difficulties, obsessive

12   ruminations and lack of confidence and low self esteem," as well as "suicidal ideation at

13   times."  The letter revealed that plaintiff "relapsed each time she made an attempt to return to

14   work" and the doctor opined that she "remains symptomatic" and "has not recovered to the

15   extent that she can be gainfully employed."  Dr. R. concluded that plaintiff's "progress is

16   guarded" and recommended "her long term disability be approved" (AR 1106).

17       Additionally, plaintiff saw Dr. Irena S. and Cynthia L., LCSW for regular monthly

18   individual therapy.  In times of heightened distress, she attended an intensive outpatient

19   psychiatry program (IOP), directed by Dr. Robert C. where patients share experiences and

20   learn coping mechanisms in a group setting.  From February to at least August 2017, plaintiff

21   attended IOP three times weekly for three hours per session.  She still attended IOP and a

22   weekly bipolar group therapy as of the April 2018 hearing.  Like Dr. R., plaintiff's therapists

23   relied on AOQ scores too, writing for example, "Patricia reports she is doing well . . . yet AOQ

24   score consistently high" and "Patricia reports she is feeling a lot better, as evidenced by a

25   PHQ9 score of 6" (AR 281, 785, 646).

26       Dr. C. and Ms. L. also submitted a joint letter to the ALJ in August 2017.  They first

27   described plaintiff's "three significant psychiatric episodes" in 2004, 2009 and January 2017,

28   during which she "exhibited severe symptoms of anxiety, panic, disturbed sleep, obsessive

United States District Court
Northern District of California

negative rumination, severe depression and suicidality." While no longer in immediate crisis, plaintiff's contemporaneous symptoms included: "high anxiety, agitation, panic, decreased concentration, memory problems, fatigue, low energy, psychomotor slowing with observable slow response time, cognitive slowing and difficulty with processing information." Moreover, they believed plaintiff's functioning was limited by: "an inability to track conversations on a linear path, not being able to sustain energy, significantly decreased ability to remember instructions, procedure, and facts, and not being able to make it through a normal work day or work week." The letter went on to detail plaintiff's prescription medication regimen, her high AOQ scores, and the therapists' joint opinion that "she would not be able to maintain regular attendance due to severity of symptoms, would definitely miss more than three days per month, and would not be able to keep a job" (AR 809–10).

### B. Evidence From Non-Treating Physicians.

Finally, agency consultants Drs. Barbara Moura and R. Ferrell reviewed plaintiff's medical records in March and November 2015, respectively. Dr. Moura found that plaintiff did indeed suffer from bipolar disorder, but that her degree of limitation ranged from mild to moderate. Taking plaintiff's activities of daily living and "fairly benign" MSEs as evidence, Dr. Moura opined that there had been significant medical improvement since plaintiff's last favorable disability determination, and that she could perform simple one to two step tasks with little public contact. Dr. Ferrell largely agreed, finding that plaintiff had experienced symptom improvement and that MSEs were normal except she was "tense and anxious." Dr. Ferrell agreed that plaintiff could perform unskilled work with limited public contact (AR 685–701, 727–45).

### 4. THE ALJ'S DECISION.

After considering the record and the testimony at the hearing, the ALJ denied plaintiff continued benefits on May 31, 2018. Following the eight-step analysis that governs continuing disability reviews, the ALJ found, in relevant part, that medical improvement had occurred, and that plaintiff's residual functional capacity would allow her to return to work as a janitor, stock clerk, or hand packager. *See* 20 C.F.R. § 404.1594(f). Plaintiff disputes these findings,

arguing that her condition has not improved, and that the ALJ made other legal errors in evaluating the evidence. The Appeals Council denied further review in July 2019 (AR 1–3). Her administrative appeals exhausted, plaintiff now seeks judicial review pursuant to 42 U.S.C. § 405(g). The parties both move for summary judgment.

## ANALYSIS

### 1. STANDARD OF REVIEW.

A decision denying disability benefits must be upheld if it is supported by substantial evidence and free of legal error. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). Substantial evidence is "more than a scintilla," but "less than a preponderance." *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996). "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and for resolving ambiguities;" thus, where the evidence is susceptible to more than one rational interpretation, the decision of the ALJ must be upheld. *Andrews*, 53 F.3d at 1039. The standard is not entirely deferential, though. The Court must consider evidence that both supports and detracts from the ALJ's conclusion, "and may not affirm simply by isolating a specific quantum of supporting evidence." *Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014).

### 2. CONTINUING DISABILITY REVIEWS.

The SSA may terminate benefits to existing disability beneficiaries upon a finding that (1) the claimant's condition has medically improved and (2) the claimant is now able to engage in substantial gainful activity. 42 U.S.C. § 423(f)(1). ALJs apply this statute by following an eight-step regulatory framework:

1. Is claimant is working?
2. Does claimant's disability meet any of the listings in 20 C.F.R. 404 Subpart P, Appendix 1?
3. Has medical improvement occurred?
4. If medical improvement *has* occurred, is the medical improvement related to claimant's ability to work?
5. If medical improvement has *not* occurred, do any of the exceptions to medical improvement apply?

6

      6. Are the claimant's current impairments, in combination, severe?

      7. What is claimant's residual functional capacity based on current impairments? Can claimant still perform previous work?

      8. If claimant can no longer perform previous work, can she perform other work in the national economy?

20 C.F.R. § 404.1594(f)(1)–(8). The ALJ's decision below registers his findings on each of these steps. Only steps three, seven, and eight of the inquiry are relevant to this order.

### 3. THE ALJ'S FINDING OF MEDICAL IMPROVEMENT CONTAINS LEGAL ERROR AND IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE.

At step three, the ALJ must determine if medical improvement has occurred since the claimant's most recent favorable disability determination, the "comparison point decision" (CPD). 20 C.F.R. § 404.1594(f)(3). Medical improvement is any decrease in the medical severity of claimant's impairments. A finding of improvement must be based on "symptoms, signs, and/or laboratory findings." 20 C.F.R. § 404.1594(b)(1).

Here, the ALJ determined that medical improvement occurred, but offered only a vague, conclusory statement to that effect. In making this finding, the ALJ wrote, in full, that "[t]he medical evidence supports a finding that, by March 1, 2015, there had been a decrease in medical severity of the impairments present at the time of the CPD" (AR 230). This finding does not apply the presumption of continuing disability recognized within our circuit, and is therefore erroneous. Further, this finding is so lacking in specificity that it cannot be supported by substantial evidence.

#### A. The ALJ Did Not Apply The Presumption Of Continuing Disability.

Generally, a claimant bears the burden of proving disability. *Andrews*, 53 F.3d at 1040. Our court of appeals has held, however, that "[o]nce a claimant has been found to be disabled . . . a presumption of continuing disability arises in her favor." *Bellamy v. Sec'y of Health & Human Servs.*, 755 F.2d 1380, 1381 (9th Cir. 1985). This presumption does not alter the standard of review — plaintiff still must prove her case, and the court still may only overturn the ALJ's decision if it is unsupported by substantial evidence or contains legal error. But it must keep in mind that the Commissioner, not the plaintiff, carries the burden of "com[ing]

7

forward with evidence that her condition has changed." *Patti v. Schweiker*, 669 F.2d 582, 587 (9th Cir. 1982).

Congress amended the Social Security Act in 1984, to prohibit, in relevant part, "any initial inference as to the presence or absence of disability being drawn from the fact that the individual has previously been determined to be disabled." 42 U.S.C. § 423(f). The SSA has previously argued in continuing disability appeals (but does not argue here) that the 1984 amendments overturn the presumption *Bellamy* articulates.[1] This argument remains unpersuasive. While "[t]he state of the Ninth Circuit law on this point is far from clear," this Court adopts the conclusion of *Medina v. Colvin*, that *Bellamy*'s presumption still applies because "[a]n inference is not the same as a presumption." Inferences allow one fact to be deduced from another fact, whereas a presumption is a burden shifting device. No. 14-CV-01967-DMR, 2015 WL 5448498 at *9–10 (N.D. Cal. Aug. 21, 2015) (Magistrate Judge Donna Ryu). Our court of appeals certainly seems to believe the presumption applies, explaining in 2007 that: "the Commissioner must prove that a claimant previously adjudged disabled has recovered sufficiently to return to work." *Parra v. Astrue*, 481 F.3d 742, 748 (9th Cir. 2007) (citing *Bellamy*, 755 F.2d at 1381). Several other district courts within our circuit have followed *Medina*, which this order also finds persuasive. *See, e.g., Lacy v. Saul*, 19-cv-00140-SI, 2019 WL 4845965 (N.D. Cal. Oct. 1, 2019) (Judge Susan Illston); *Purnell v. Colvin*, No. CV-14-02716-PHX-ESW, 2016 WL 8671597 (D. Ariz. June 17, 2016) (Magistrate Judge Eileen Willett); *Bracksiek v. Saul*, No. 2:18-cv-00661 AC, 2019 WL 2567143 (E.D. Cal. June 21, 2019) (Magistrate Judge Allison Claire).

Plaintiff is thus entitled to a presumption that her disability continued, subject only to a showing by the Commissioner of "evidence sufficient to rebut this presumption." *Bellamy*, 755 F.2d at 1381. In other words, to take Social Security benefits away from an existing recipient, the Commissioner must affirmatively "come forward with evidence that her

---

[1] The *Bellamy* opinion, issued in March 1985, did not consider the 1984 amendments.

condition has changed." *Patti*, 669 F.2d at 587. The decision below does not convincingly show that plaintiff's condition has changed.

A finding of improvement necessarily requires a comparison. The governing regulation explains as much: "we will *compare* the current medical severity . . . to the medical severity of that impairment(s) at [the CPD]." 20 C.F.R. § 404.1594(b)(7) (emphasis added). But to support his finding of medical improvement, the ALJ wrote *only* that "[t]he medical evidence supports a finding that, by March 1, 2015, there had been a decrease in medical severity of the impairments present at the time of the CPD" (AR 230). Citing a "decrease in medical severity," without more, is not a legitimate comparison. To perform a sufficiently rigorous analysis at step three, the ALJ should have compared plaintiff's bipolar and anxiety disorders as of September 2011 with those same impairments as of April 2018, and explained how the impairments *changed*, with support from the record. *See Gallant v. Saul*, 783 Fed.Appx. 688, 690 (9th Cir. 2019). Without such analysis, the Commissioner has not carried his burden of "com[ing] forward with evidence" that plaintiff's "condition has changed." *Patti*, 669 F.2d at 587. The ALJ erroneously found medical improvement without applying the presumption of continuing disability that plaintiff is entitled to.

### B. The ALJ Did Not Support His Finding With Any Evidence.

Any evidence the Commissioner produces to overcome the presumption of continuing disability is reviewed under the "substantial evidence" standard, explained above. *Bellamy*, 755 F.2d at 1381. But here too the decision below falls short, failing to provide even a "scintilla" of evidence to support that conclusion. *Smolen*, 80 F.3d at 1279. Recall that findings of medical improvement must be based on "symptoms, signs, and/or laboratory findings." 20 C.F.R. § 404.1594(b)(1). Instead here, the ALJ gestured broadly to "the medical evidence." But the regulation tells us that *any* determination of medical improvement must rely on "symptoms, signs, and/or laboratory findings," *i.e.*, medical evidence. Thus, the ALJ's substantiation at step three is wholly conclusory.

9

The law does not require much evidence to support an ALJ's conclusion — substantial evidence is somewhere between a scintilla and a preponderance. *Smolen*, 80 F.3d at 1279. While it is true that the ALJ discussed symptoms, signs, and other objective medical findings *elsewhere* in his decision, on step three, he failed to point to a *single* symptom, sign, or laboratory finding at all. As our court of appeals explained in *Gallant*, a determination of medical improvement requires a comparison between two dates, which itself requires an analysis of the claimant's impairments "by considering the symptoms, signs, and laboratory findings . . . in *both those years*." 783 Fed.Appx. at 690 (emphasis added). Nowhere in the decision below does the ALJ analyze the medical severity of plaintiff's impairments as of 2011. Conclusory language that leaves the reader to intuit the ALJ's reasoning, especially in light of the government's heightened burden, does not clear this low evidentiary hurdle. The ALJ did not ground his finding of medical improvement in substantial evidence, and failed to apply the presumption of continuing disability. This legal error merits remand.

### 4. THE ALJ ERRONEOUSLY RELIED ON AN INCOMPLETE HYPOTHETICAL.

Steps seven and eight of the eight-step analysis concern the claimant's ability to engage in substantial gainful activity. At step seven, the ALJ must assess all of claimant's current impairments to determine whether she can return to prior work. If she cannot, the analysis proceeds to step eight, where the burden shifts to the Commissioner to prove that the claimant can do other work that exists in the national economy. 20 C.F.R. § 404.1594(f)(7)–(8); *Lewis v. Apfel*, 236 F.3d 503, 517 (9th Cir. 2001). ALJs may use vocational experts to ascertain what other work exists in the national economy that a claimant could perform. But the ALJ's hypothetical questions "must set out *all* of the claimant's impairments," else, "the vocational expert's opinion has no evidentiary value." *Lewis*, 236 F.3d at 517 (emphasis added).

In the decision below, the ALJ determined that while plaintiff could not return to her previous work as a teacher, she could perform a significant number of other jobs in the national economy. But this finding relied on an incomplete hypothetical:

> Assume [an] individual of the claimant's age, education and work experience who's able to perform the full range of work at all

> exertional levels, with the following specific limitations. The individual can perform simple, routine, repetitive tasks; can tolerate a low level of work pressure defined as work not requiring multi-tasking, detailed job tasks, significant independent judgment, a production rate pace, teamwork in completing the jobs or contact with the public.

McAlpine testified, and the ALJ found, that such an individual could not work as a teacher, but could work as a janitor, stock clerk, and hand packager (AR 234–35, 316–18, 235).

This hypothetical ignores plaintiff's well-supported probable absenteeism. Patricia and her daughter testified that it was difficult for her to leave the home, and that she experienced especially severe panic attacks about once every four days. Moreover, plaintiff's treating medical sources agreed that she would "definitely miss more than three days per month due to severity of symptoms" (AR 235, 307, 809).

The ALJ was certainly aware of this limitation. At the hearing, he even added it to another hypothetical question posed to the vocational expert (AR 316–19). Yet in his decision, the ALJ relied on the hypothetical question that did *not* mention plaintiff's absenteeism, without explaining why he ignored it. The law requires more. When a "hypothetical posed by the ALJ to the vocational expert d[oes] not reflect all of [plaintiff's] limitations, the expert's opinion has no evidentiary value and cannot support the ALJ's decision." *Embrey v. Bowen*, 849 F.2d 418, 423 (9th Cir. 1988).

**5.   THE ALJ DID NOT PROPERLY CREDIT EVIDENCE SUBMITTED BY TREATING PHYSICIANS.**

When evaluating medical evidence, the SSA generally gives more weight to opinions from treating practitioners. Our court of appeals provides further guidance:

> If a treating physician's opinion is not contradicted by other evidence in the record, the ALJ may reject it only for "clear and convincing" reasons supported by substantial evidence in the record. But if the treating doctor's opinion is contradicted by another doctor, the ALJ may discount the treating physician's opinion by giving "specific and legitimate reasons" that are supported by substantial evidence in the record.

*Ford v. Saul*, 950 F.3d 1141, 1154 (9th Cir. 2020) (citations omitted). In short, well-supported, uncontradicted opinions from the claimant's treating physicians should carry significant

11

weight. If a treating doctor's opinion *is* contradicted by another doctor, it may be discounted for specific, legitimate reasons that find substantial support in the record.

Instead, at step seven, the decision below "accord[ed] great weight to the opinions of Drs. Moura and Ferrell," the non-treating medical consultants who each reviewed plaintiff's medical file once. On the other hand, it "accord[ed] partial weight" to Dr. C. and Ms. L., plaintiff's therapists, and was "not persuaded by Dr. [R.]'s statement," plaintiff's psychiatrist *since 1995*. The ALJ explained that he discounted Dr. C., Ms. L., and Dr. R.'s statements because they were "inconsistent" with some of plaintiff's daily activities as well as the MSEs the treating doctors recorded (AR 233–34). But this evidence did not contradict the doctors — they either provided or already knew about it.

The daily activities the ALJ cited as being ostensibly inconsistent with the treating doctors' medical opinions are not actually so. The ALJ pointed out that plaintiff sometimes babysat her grandson, provided transportation for her daughter, and went to church (AR 276, 280–82). Plaintiff's treating doctors and therapists knew she performed these normal, routine activities, and *still* advised that she could not return to work.

The ALJ also pointed to "fairly benign" MSEs and "moderate to transient" Global Assessment of Functioning scores as evidence contradicting the treating physicians' statements. Plaintiff's treating doctors were well-aware of her MSEs and GAF scores — in fact, they administered them — but again, they still concluded that her "progress is guarded," and "she has not recovered to the extent that she can be gainfully employed" (AR 809–10; 1106). Moreover, GAF scores are highly unpersuasive evidence because the treating physicians don't appear to have relied upon them. Instead, Dr. R. and plaintiff's therapists relied on the AOQ and its component PHQ-9 and GDS scores, citing these metrics both in their letters to the ALJ and extensively in contemporaneous appointment notes (*see, e.g.,* AR 846, 795, 1088, 1095). Curiously, the ALJ did not respond to the treating physicians' repeated assertions that plaintiff's AOQ scores reflect her limited functional abilities.

By citing evidence that plaintiff's treating doctors knew about but did not take much stock in, the ALJ again failed to identify a contradiction. In giving greater weight to Drs.

12

Moura and Ferrell's reading of plaintiff's file, the ALJ favored a non-treating physician's interpretation of a treating physician's notes — over the treating physician's *own* impressions. Finding no legitimate contradictions between the treating and non-treating medical opinions, the ALJ failed to reject the treating physicians' opinions on sufficiently "clear and convincing" grounds. *Ford*, 950 F.3d at 1154.

## CONCLUSION

The ALJ's errors at steps three, seven, and eight are sufficient to grant plaintiff's motion for summary judgment and remand this case. While this order does not address all of plaintiff's claims of error, other areas of the decision below give pause and will require greater specificity on remand. The ALJ is reminded, for example, that subjective testimony may not be discarded lightly. Our court of appeals has "repeatedly warned" that ALJs "must be especially cautious in concluding that daily activities are inconsistent with testimony about pain," explaining, "impairments that would unquestionably preclude work and all the pressures of a workplace environment will often be consistent with doing more than merely resting in bed all day." *Garrison*, 759 F.3d at 1016. Claimants need not be "utterly incapacitated in order to be disabled." *Vertigan v. Halter*, 260 F.3d 1044, 1050 (9th Cir. 2001).

For the reasons stated herein, the decision of the ALJ is **VACATED**, and the case is **REMANDED** for further proceedings consistent with this order.

**IT IS SO ORDERED.**

Dated: August 11, 2020.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE